**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IKIA TRUESDALE,

   *Plaintiff*,

 v.

DISTRICT OF COLUMBIA,

   *Defendant*.

No. 21-cv-315 (DLF)

**<u>MEMORANDUM OPINION</u>**

  Ikia Truesdale brings this action against her employer, the District of Columbia.  She claims that the District discriminated against her because of her race, color, and sex and retaliated against her when she engaged in protected activity.  Before the Court is the defendant's Motion for Summary Judgment.  Dkt. 48.  For the following reasons, the Court will grant the defendant's motion.

**I.  BACKGROUND**

  Truesdale is an African American woman who began working for the District as a police officer in September 2016.  Def.'s Stat. of Undisputed Material Facts (SUMF) ¶¶ 1–2, Dkt. 48-2. During her time with the Metropolitan Police Department (MPD), Truesdale was the subject of multiple Supervisory Support Program (SSP) investigations.  *See* Def.'s Ex. Y, Dkt. 48-3 (2018 violations); Def.'s Ex. K, Dkt. 48-3 (February 18, 2019 incident); Def.'s Ex O, Dkt. 48-3 (August 19, 2019 incident); *see also* Def.'s SUMF ¶ 47 (Truesdale "recalled receiving three SSPs."). Because her discrimination and retaliation claims focus principally on several workplace incidents and a delay in approving her request for outside employment, *see* Am. Compl. ¶¶ 57–75, the Court will briefly recount facts related to each.

### A.    Workplace Incidents and Investigations

#### 1.    *The February 18, 2019 Incident*

On February 18, 2019, Truesdale was assigned to patrol a designated area during the overnight shift.  Def.'s SUMF ¶ 18.  Around midnight, while performing "beat checks," Sergeant Enis Jervic saw two police cruisers, one of which he believed to be driven by Truesdale, returning from an area outside of her designated beat.  Def.'s Ex. K 2.  Jervic radioed Truesdale to ask her to meet him.  *Id.*  In Jervic's account of this meeting, Truesdale carried herself with "the utmost disrespect" and acted "hostile."  Def.'s Ex. K, Attach. #3.  According to Truesdale, however, she was professional and used a non-offensive tone.  Def.'s Ex. K 2.  Jervic reported this incident and wrote up an incident summary.  *See id.*  Truesdale also "immediately" reported this incident to Lieutenant Patrick Brescia.  *See* Def.'s SUMF ¶ 20; Def.'s Reply SUMF 7–8, Dkt. 51-1.

Two days later, on February 20, 2019, Truesdale received notice that she had reached the Supervisory Support Threshold (SSP) of 100 points for four incidents that occurred in 2018: three body-worn-camera violations and one violation for losing MPD property.  Def.'s Ex. Y 1.

Following the February 18, 2019 incident, the MPD investigated Jervic's incident report in accordance with MPD standard procedure.  Def.'s SUMF ¶¶ 22–23.  The investigator used GPS data from Truesdale's police cruiser to determine whether she was outside her designated area that evening.  *See* Def.'s Ex. K 6–7.  Based in part on that data, the investigator's May 30, 2019 report concluded that Truesdale disregarded orders the night of February 18, 2019, by failing to go directly to her assigned area.  *Id.* at 7–8.

On June 5, 2019, Truesdale submitted an Equal Employment Opportunity (EEO) form to the MPD's EEO office for alleged discrimination and retaliation by Jervic.  Def.'s SUMF ¶ 24.  The EEO investigated and "did not discern any evidence" that Jervic discriminated against

Truesdale. *Id.* ¶ 25. The EEO dismissed her complaint and provided her with a right-to-sue letter. *See* Def.'s Ex. M, Dkt. 48-3.

On June 14, 2019, at the Commander's Resolution Conference, reviewers determined that the investigator's May 30, 2019 conclusions about the February 18, 2019 incident were unsubstantiated. Def.'s Ex. N, Dkt. 48-3. In particular, the investigation revealed that Jervic mistook Truesdale's police cruiser for another officer's cruiser, although GPS data for Truesdale's cruiser confirmed that she was in fact outside her assigned block on February 18, 2019. *See* Def.'s Ex. K 2, 7–8.

Nonetheless, on July 2, 2019, Truesdale was notified that she had reached the SSP threshold due to the February 18, 2019 incident. Def.'s Ex. T, Dkt. 48-3. When asked why Truesdale would receive the notification after the charge being unsubstantiated, Commander William Fitzgerald was unsure, but he said that the numbers are computer generated, and that the system would sometimes assess points even if those points were not yet sustained. Def.'s Ex. E (Fitzgerald Dep.), at 79:13-80:22, Dkt. 48-3.

2.     *Other 2019 Workplace Incidents*

Truesdale's workplace troubles continued. The night of August 19, 2019, Truesdale was assigned to patrol an area with a history of violence. Def.'s Ex. O 12, Dkt. 48-3. In fact, a shooting had occurred there six days earlier. *Id.* Yet, around 3:40 a.m., another officer found Truesdale asleep in her cruiser with a neck pillow around her neck. *Id.* This officer had time to shine his flashlight on Truesdale twice and even take a picture of her. *Id.*; *see also* Def.'s Ex. O, Attach. #10 (picture). Only after he tapped on the window did Truesdale open her eyes. Def.'s Ex. O 12. She admitted that she fell asleep, Def.'s SUMF ¶ 28, and agreed to serve a 5-day suspension for sleeping on duty, Def.'s Ex. P, Dkt. 48-3.

3

On December 2, 2019, Truesdale left the scene of a traffic accident and didn't complete the mandatory accident report until four days later.  *See* Def.'s Ex. Q, Dkt. 48-3.  She left the scene to go shopping, in unform, in full view of the public.  *Id.*  That same day she also violated other department polices by texting while driving and notifying the police dispatcher that she arrived at the scene of a "man with a gun call" two minutes and thirty seconds before she arrived.  *Id.*  For this conduct, Truesdale received a fifteen-day suspension with ten days held in abeyance.  Def.'s Ex. R, Dkt. 48-3.

### 3.    *Supervisory Support Program and Performance Reviews*

On August 17, 2019, Truesdale met with Sergeants Jeffrey Kopp and Michael Lybarger for an assessment and intervention plan meeting.  Def.'s Ex. T 1; Pl.'s Resp. Def.'s SUMF 7, Dkt. 50-2.  The resulting SSP report described Truesdale as "nonchalant" and habitually tardy and identified that she had not made any arrests in the previous eight months, an uncommonly low number for a patrol officer in District 5.  Def.'s Ex. T 3.

After the neck-pillow incident, Truesdale met with Lybarger for another performance review on October 23, 2019.  Def.'s SUMF ¶ 42.  Lybarger asked Truesdale to score herself, and she gave herself a "3."  *Id.*  He then stated that she did not deserve a "3," and that he wanted to give her a "2."  *See id.* ¶ 39.  But because giving a "2" requires creating a performance improvement plan (PIP), he ultimately gave her a "3" for the period from October 1, 2018, to September 30, 2019.  *Id.* ¶¶ 39–40.  Two days later, Truesdale contacted the EEO to discuss the change of her performance review score.  *Id.* ¶ 43.  She received a right-to-sue letter on November 27, 2019.  Def.'s Ex. W, Dkt. 48-3.

4

### B. Outside Employment Approval

While at the MPD, Truesdale participated in approved outside employment. Def.'s SUMF ¶¶ 13–16. Under MPD policy, "eligible employees" may work up to thirty-two hours per week of outside employment. *Id.* ¶ 6. That policy exists because the MPD "recognizes the benefits of outside employment, both to its members and the community." *Id.* ¶ 5. Truesdale reported that she worked at the American Psychological Association for sixteen hours per week during the first quarter of 2019 and twelve hours per week during the second quarter. *Id.* ¶¶ 13–14.

On April 29, 2019, Truesdale applied for outside employment at a Chick-Fil-A store and a Whole Foods Market, both in D.C. Pl.'s Resp. Def.'s SUMF 3; Pl.'s Ex. 4, Dkt. 50-4. Her application was returned on May 6, 2019, because she needed to fill out a separate application for each prospective employer. *See* Def.'s Ex. H, Dkt. 48-3. On June 28, 2019, Sergeant Barbara Hawkins forwarded Truesdale's requests for approval through the chain of command. Def.'s Ex. F, Dkt. 48-3; Def.'s Ex. G, Dkt. 48-3. The next business day, July 1, 2019, Fitzgerald recommended approval of Truesdale's outside employment. Def.'s Ex. G. Truesdale's Chick-Fil-A request was approved on July 2, 2019, *id.*, and her Whole Foods request was approved on July 5, 2019, Def.'s Ex. F.

### C. Procedural History

Truesdale filed this suit on February 3, 2021, alleging discrimination, retaliation, and hostile work environment claims under Title VII of the Civil Rights Act of 1964. Pl.'s Compl., Dkt. 1. The Court dismissed her original complaint for failure to state a claim on March 30, 2022, and granted her thirty days to seek leave to amend. March 30, 2022 Order 1, Dkt. 12. Truesdale later moved for leave to amend, Dkt. 15, which the Court granted. The District moved to dismiss her Amended Complaint. Dkt. 18. The Court denied the District's motion as to Truesdale's

discrimination and retaliation claims but granted the District's motion as to the hostile work environment claim. January 25, 2023 Order 1, Dkt. 23. Following discovery, the District moved for summary judgment on the remaining claims. Def.'s Mot. for Summ. J., Dkt. 48.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one "that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248 (citation modified); *Holcomb*, 433 F.3d at 895. In reviewing the record, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   ANALYSIS

Title VII prohibits an employer from discriminating against an employee or retaliating against that employee for invoking the Title VII apparatus. *See Baloch v. Kempthorne*, 550 F.3d

1191, 1196 (D.C. Cir. 2008); *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173–74 (2011). If a plaintiff cannot present direct evidence of discrimination or retaliation, the Court assesses her claims under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (applying *McDonnell Douglas* to analyze a discrimination claim); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (applying *McDonnell Douglas* to analyze retaliation claims). Since Truesdale claims to have direct evidence of discrimination and retaliation, Pl.'s Opp'n 4–11, Dkt. 50-3, the Court will consider that evidence first.

### A.    Direct Evidence

Discrimination and retaliation "can be proven by direct evidence rather than through the *McDonnell Douglas* prima facie case." *Gordon v. U.S. Cap. Police*, 778 F.3d 158, 161–62 (D.C. Cir. 2015); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("[I]f a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case."). Direct evidence is evidence that "proves the particular fact in question without any need for inference." *Seed v. Regan*, 643 F. Supp. 3d 129, 137 (D.D.C 2022) (citation modified and emphasis omitted); *see Oviedo v. WMATA*, 948 F.3d 386, 394 (D.C. Cir. 2020) (direct evidence "usually takes the form of a statement that itself shows bias against a protected class in the employment decision" (citation modified)). If a plaintiff provides direct evidence, that evidence alone is sufficient for a plaintiff to survive a motion for summary judgment. *Oviedo*, 948 F.3d at 394 (direct evidence is "sufficient on its own to entitle a plaintiff to a jury trial").

Truesdale provides no direct evidence. What she calls "direct evidence" is a series of bolded deposition quotes, *see* Pl.'s Opp'n 4–10, that are either the personal beliefs of witnesses or speculation. For example, Truesdale cites Sergeant Darlene Bratcher-Johnson's deposition

testimony that it was her "belief and experience" that male and female officers were treated differently. *See* Pl.'s Opp'n 5. But a witness's belief about differing treatment in general is not direct evidence of discrimination against Truesdale. *Cf. Oviedo*, 948 F.3d at 394 ("Direct evidence . . . usually takes the form of a statement that itself shows bias against a protected class in the employment decision." (citation modified)).

The rest of Truesdale's proffered evidence is highly speculative. She quotes a portion of Hawkins's deposition testimony in which she surmised that her the supervisors did not take well to her "because I guess I was a female." Pl.'s Opp'n 6. But Hawkins was speaking about herself— not Truesdale. When it came to Truesdale's treatment, Hawkins stated that the supervisors did not like Truesdale because she asked questions. *Id.* at 8. Hawkins further speculated that Truesdale was disciplined more harshly than white officers, *id.*, and that Truesdale had similar experiences with supervisors as Hawkins had, *id.* at 5. Hawkins did not offer any specific statements or other decisions by Truesdale's supervisors to support this inference besides Truesdale going on midnight patrols by herself, *see* Pl.'s Ex. 2 (Hawkins Dep.), at 24:1–27:14, Dkt. 50-4, a fact that Truesdale also considers direct evidence, Pl.'s Opp'n at 6. Truesdale further describes that Lybarger had a white girlfriend who could "do a whole bunch" of unspecified things "that other people were not able to do," *id.* at 8, and points to Lybarger being "not surprised" to learn that other women had sued the department, *id.* at 10.

None of this evidence constitutes direct evidence of discrimination. Truesdale has provided no statements, oral or written, that, for example, show she was disciplined because of her sex or race. *See Bhatnager v. Sunrise Senior Living, Inc.*, 935 F.Supp.2d 1, 6 (D.D.C. 2013) (comments about the plaintiff getting "old" and urging him to retire were not direct evidence of age discrimination "[w]ithout evidence that the speaker participated in the decision to terminate [the]

plaintiff"); *cf. Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) ("a statement that itself shows racial or gender bias in the decision" is an example of direct evidence).  Moreover, not only are personal beliefs and speculation about discrimination in the workplace not direct evidence, but they are also "insufficient to defeat a motion for summary judgment."  *Clemmons v. Acad. for Educ. Dev.*, 70 F. Supp. 3d 282, 308 (D.D.C. 2014) (citing *Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67 (D.D.C. 2011)).  Truesdale's "direct" evidence is indirect evidence at best.

### B.    *McDonnell Douglas*

Because Truesdale "presents no direct evidence of discrimination or retaliation [s]he must rely on indirect evidence, using the three-step framework for such claims set forth in *McDonnell Douglas*."  *Oviedo*, 948 F.3d at 395.  Under that framework, the plaintiff has the burden of first establishing a prima facie case of discrimination by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citation modified).  If "the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action in question."  *Id.* (citation modified).  "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (citation modified).  The D.C. Circuit, however, has instructed that if the employer "has asserted a legitimate, non-discriminatory reason" for the challenged action, "the district court need not— *and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).

Instead, "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006) (citation modified).

In evaluating an employer's proffered legitimate, nondiscriminatory reasons, four factors are "paramount": (1) "the employer must produce evidence that a factfinder may consider at trial"; (2) the factfinder "must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) "the reason must be facially credible in light of the proffered evidence"; and (4) "the evidence must present a clear and reasonably specific explanation." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (citation modified).

Once a defendant offers a nondiscriminatory rationale, the question at the summary judgment stage is whether the plaintiff "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the [plaintiff] on the basis of race, color, religion, sex, or national origin." *Brady*, 520 F.3d at 494. To do so, a plaintiff can point to "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). In other words, a plaintiff may succeed "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) (citation modified). But

"a plaintiff will not survive summary judgment where the plaintiff create[s] only a weak issue of fact as to whether the employer's reason[s] . . . [for the action were] untrue and there is abundant and uncontroverted independent evidence that no discrimination has occurred." *Oviedo*, 948 F.3d at 395 (citation modified).

### 1.    *Discrimination Claims*

Truesdale's arguments about alleged discrimination center around four actions: (1) the investigations and SSPs that her supervisors imposed; (2) the delay in approving her request for outside employment at Chick-Fil-A and Whole Foods; (3) the modification of her performance review score; and (4) being assigned to patrol by herself. *See* Am. Compl. ¶¶ 57–75; Pl.'s Opp'n 4–26. The District has proffered nondiscriminatory, legitimate reasons for each action. Truesdale does not contend that the evidence offered by the District in support of these reasons is inadmissible. *See generally* Pl.'s Opp'n (offering no argument about the admissibility of the District's evidence). Instead, she argues that she "can prove that the reasons set forth by the [District] are false." *Id.* at 19. The Court thus turns to Truesdale's pretext arguments, keeping in mind that "there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts" if the employer's reason "is reasonable in light of the evidence." *Brady*, 520 F.3d at 495.

### i.    SSPs

The District contends that Truesdale was properly placed into each of her SSPs because she repeatedly exceeded the point threshold that triggers an investigation. Def.'s Mem. in Supp. 14, Dkt. 48-1. The District's evidence shows that, during the relevant timeframe, Truesdale's tenure at the MPD was characterized by poor performance and mistakes. Truesdale fails to establish that the District's reasons for her SSPs are pretextual.

Truesdale's first SSP was initiated in February 2019, for three violations of MPD's body-worn-camera policy and for losing MPD property.  Def.'s Ex. Y.  She does not offer any evidence that she did not, in fact, commit the underlying violations.  *See* Pl.'s Resp. Def.'s SUMF 12.  She instead asserts, without any specific evidence, that her supervisors assessed the points because she reported harassment.  *Id.* (citing to the entirety of Def.'s Index of Exhibits).

She was notified of her next SSP on July 2, 2019.  Def.'s Ex. T 1.  This SSP was for the February 18, 2019 incident, *id.*, and followed the MPD investigator concluding that Truesdale had been insubordinate, Def.'s Ex. K 7–8.  The District acknowledges that Truesdale should not have received this SSP because the investigation's conclusions were determined to be unsubstantiated at the Commander's Resolution Conference.  Def.'s Reply SUMF 22–23; Def.'s Ex. N.  But the District explains that Truesdale was incorrectly notified of the SSP because of a computer error, *see* Fitzgerald Dep. 79:13-80:22, not discrimination.  Truesdale fails to establish that this reason is pretextual. She offers no evidence to challenge that a computer error was the reason for her erroneous notification.  *See generally* Pl.'s Opp'n (no mention of the computer system).  Instead, she contends that her supervisors "misused PPMS" and, again, cites to the District's entire Index of Exhibits.  *See* Pl.'s Resp. Def.'s SUMF 13.  A conclusory statement and sweeping reference to the District's exhibits does not create a dispute of material fact.  *See Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) ("Courts may grant summary judgment to a defendant where a plaintiff's evidence is vague or conclusory.").

Truesdale was also the subject of two other disciplinary proceedings.  On October 8, 2019, she attended a Commander's Resolution Conference after she was reportedly found asleep on duty, in her police car and in view of the public, with a neck pillow wrapped around her neck.  *See* Def.'s Exs. O, P.  Truesdale accepted the resulting suspension.  Def.'s Ex. P.  And in December 2019,

12

she left the scene of a traffic accident to go shopping in uniform, texted while driving in the rain, and lied to the dispatcher about when she arrived at the scene of a gun call. Def.'s Ex. Q. She also failed to complete the mandatory traffic accident form until four days later. *Id.* MPD notified her on March 25, 2020, that she was subject to an SSP for the December incidents, *id.*, and she served a five-day suspension for her actions, Def.'s Ex. R. Truesdale has not contested any of the facts of these incidents.

For each of the SSPs, Truesdale argues that the Court should infer that her supervisors discriminated against her because of a general culture of discrimination at the MPD. *See* Pl.'s Opp'n 24–26. But neither the record nor the law supports such an inference. In a discrimination case, "general bias" is insufficient to survive summary judgment. *Iyoha v. Architect of the Cap.*, 927 F.3d 561, 569 (D.C. Cir. 2019) (citation modified). Truesdale must show that the sanctions against her were "motivated by that bias," *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016), yet she fails to introduce evidence that supports concluding she was investigated because of her race, color, or sex. The evidence she does offer—from Sergeant Wright's and Sergeant Hawkins's depositions—speaks only to their perceptions of general bias in the workplace. *See* Pl.'s Opp'n 15, 25. Without "evidence for a reasonable jury to find that her [investigation] was motivated by that bias," she has failed to establish pretext. *Morris*, 825 F.3d at 670.

Truesdale likewise argues that pretext can be inferred for each SSP because similarly situated white male officers received preferential treatment and were not reprimanded for policy violations. *See* Pl.'s Opp'n 14. But she offers no evidence that she was similarly situated to any of the officers she names. For Title VII purposes, another employee is similarly situated if "all of the relevant aspects of [her] employment situation were nearly identical to those of [the plaintiff]" and that other employee was "charged with offenses of comparable seriousness." *Burley v. Nat'l*

13

*Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (citation modified).  General statements that fail to controvert the District's particular concerns or speak to areas of Truesdale's work "other than what [her] supervisors identified as deficient" are insufficient to establish that she was treated more harshly than her coworkers.  *Johnson* 823 F.3d at 710.

Truesdale's proffered comparator evidence falls well short of the mark.  For one, she points to a single page from Lybarger's deposition testimony that says that other officers had also fallen asleep.  Pl.'s Opp'n 14.  But Lybarger said nothing about other officers receiving preferential treatment or not being sanctioned.  *See* Pl.'s Ex. 6 (Lybarger Dep.), at 67:1-22, Dkt. 50-4.  In fact, Lybarger stated that he was unaware of what sanction these other unnamed officers received for falling asleep.  *Id.*  Undeterred, Truesdale then lists off a series of officers' names who she asserts incurred the same violations as her but were not reprimanded, without a single cite to the record. *See* Pl.'s Opp'n 14.[1]  Without evidence in the record to substantiate her claims, Truesdale "has failed to demonstrate that" she was similarly situated with the other officers she names in her brief. *Burley*, 801 F.3d at 301.

She then offers a host of other alleged and unsubstantiated misconduct as evidence. Truesdale asserts that Jervic would get intoxicated, that he was involved in a police shooting, and that EEO complaints were filed against a different officer in the department.  *See* Pl.'s Opp'n 14–15.  These facts are not included in either party's statement of facts or the responses to those statements of facts.  *See generally* Def.'s SUMF; Pl.'s Resp. Def.'s SUMF; Pl.'s Stat. Disputed Material Facts (SDMF), Dkt. 50-2; Def.'s Resp. Pl.'s SDMF, Dkt. 51-1; Def.'s Reply SUMF.

---

[1] Truesdale's amended complaint alleged that Officers Glen and Quinlan are "white male officers allowed to leave their assigned areas without facing discipline."  Pl.'s Amend. Compl. ¶ 20. Though she continues to mention both names in her opposition memorandum at summary judgment, Pl.'s Opp'n 14, she offers no evidence about either officer.

Thus, these facts are unsupported, *see* Fed. R. Civ. P. 56(c), and do not create a genuine dispute, *see* Fed. R. Civ. P. 56(e).

Truesdale's assertions, moreover, do not even support an inference of discrimination. The only record support for these claims is Hawkins's speculation. *See* Hawkins Dep. 39:17-40:22. And, even if true, none of these accusations substantiates an inference that Jervic, or any other officer, discriminated against Truesdale. *See Walker*, 798 F.3d at 1092, 1094 (proffered evidence must be "evidence that a jury could reasonably conclude evinces an illicit motive" and "mere speculation . . . does not present a genuine dispute of material fact"); *Vatel*, 627 F.3d at 1248 ("[W]e cannot green-light a trial based on . . . mere speculation.").

Finally, Truesdale states that she was "disciplined" by Lieutenant Dowling for leaving her designated area to get food despite receiving permission from Bratcher-Johnson. Pl.'s Opp'n 22. To Truesdale, this mix-up justifies concluding that "the SSP and investigations [are not] credible." *Id.* at 23. The deposition portions that she cites, however, hurt her case because Bratcher-Johnson said that Dowling asking for Truesdale's mileage is "not out of the norm," but rather is common practice when an officer suspects another of leaving their designated area. Pl.'s Ex. 5 (Bratcher-Johnson Dep.), at 21:11–16, Dkt. 50-4.[2] Truesdale does not specify whether Dowling's question is the "reprimand[] and discipline[]" she experienced. *See* Pl.'s Opp'n 21–22. Nor does she name other officers who were allowed to get food outside their areas without incurring the same discipline. *See id.* Accordingly, the Court finds "no basis in the record upon which a reasonable factfinder could conclude" from "whatever investigative flaws or unfairness [Truesdale] may have

---

[2] This event is also not evidence of retaliation because it occurred on June 6, 2020, Bratcher-Johnson Dep. 19:19–20:3, more than six months after the December 2019 incidents. Even two-and-a half or three months of separation can be too long a gap to establish a causal link, *see Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (citing cases), much less six months.

suffered relating to this incident" that the defendant "was motivated by [her] race," color, or sex, *Burley*, 801 F.3d at 302, or that the defendant's justifications for months-earlier actions were pretextual.

ii.      Outside Employment Approval

According to the District, Truesdale's own error caused the delay in approving her applications for outside employment. Def.'s Mem. in Supp. 9–10; Def.'s Ex. H. After Truesdale submitted her application at the end of April 2019, the MPD sent it back to her because she needed to fill out a separate form for each employer. Def.'s Ex. H (email instructing Truesdale to "complete separate requests for each worksite"). The record is silent until June 28, 2019, when her corrected applications were forwarded through the chain of command. Def.'s SUMF ¶¶ 9–10; Def.'s Exs. F, G. The very next business day, Fitzgerald recommended approval. Def.'s Ex. G. Then, the following day, Truesdale's Chick-Fil-A application was approved, *id.*, with her Whole Foods application approved several days later, Def.'s Ex. F. In sum, only four business days lapsed from June 28, 2019, the date that Truesdale's separate, corrected packages were sent to command for approval, until July 5, 2019, when her second application was approved.[3] *See* Def.'s Ex. F.

Truesdale tries to establish pretext for the delay in two ways. First, she argues that the approval process is generally quick and that white male officers were approved faster than her. *See* Pl.'s Opp'n 14, 18. But the typical brevity of the process does not contradict the District's explanation for Truesdale's wait—that Truesdale had to correct her initial, omnibus application because each prospective employer requires its own application. Likewise, Truesdale's similarly situated argument fails because, as explained above, she fails to identify any similarly situated

---

[3] This calculation excludes July 4, 2019, because it was a national holiday.

16

officers.  General assertions of similarity without evidence are insufficient to survive a motion for summary judgment.  *See Burley*, 801 F.3d at 301.

Second, Truesdale argues that the process was held up by the investigation into the February 18, 2019 incident.  As discussed above, the District had legitimate, non-discriminatory grounds for launching the investigation: it was standard procedure to investigate once a charge of a directives violation or insubordination was made.  Def.'s SUMF ¶ 22.[4]  Truesdale offers the MPD guidelines as evidence, but the guidelines do not say that an investigation can delay approval of an application for outside employment, *see* Pl.'s Ex. 2 (Hawkins Dep.), at Ex. J, Dkt. 50-4, thus undermining her effort to link the delay to the investigation, rather than her failure to submit separate applications for each outside employer.  Moreover, the facts do not support Truesdale's claim that the incorrect SSP notification caused the delay.  Truesdale was notified of exceeding the threshold on July 2, 2019—the same day that her Chick-Fil-A outside employment application was approved.  Def.'s Ex. G.  She was also approved for outside employment at Whole Foods three days later.  Def.'s Ex. F.  On this record, the Court finds that no reasonable jury could conclude that a three-day delay on one of Truesdale's applications supports inferring that her application was intentionally delayed by an allegedly discriminatory investigation.  *See Brady*, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.").

---

[4] Truesdale responds to this fact by denying that "an investigation is required or warranted."  Pl.'s Resp. Def.'s SUMF 5–6.  But she then argues that "[a]n inquiry would suffice" without any indication of what differentiates an "inquiry" from an "investigation."  Def.'s Reply SUMF 8. Accordingly, the Court considers this fact undisputed.  *See* Fed. R. Civ. P. 56(e).

Given Truesdale's lack of evidence, no reasonable jury could find the District's non-discriminatory explanation for the delay in processing her applications for outside employment to be "'unworthy of credence' or tainted by racial animus." *Sanders v. Metro. Police Dep't*, 79 F. Supp. 3d 220, 225 (D.D.C. 2015) (quoting *Tex. Dep't Cmty Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

### iii.   Performance Review Score

Truesdale argues that a question of material fact remains—whether she "was a good employee." Pl.'s Opp'n 20. While Hawkins thought Truesdale performed well, *see* Pl.'s SDMF ¶ 1, Truesdale offers no evidence contradicting the many infractions, including sleeping with a neck pillow and leaving the scene of an accident, to which the District points as legitimate, non-discriminatory reasons for her SSPs. *See Johnson* 823 F.3d at 707 ("[A]lthough there is record evidence that [the plaintiff] performed well in some areas, there is no evidence contradicting [his supervisor's] conclusion that [the plaintiff] could not perform his assigned tasks at the level expected."); Def.'s Reply 6, Dkt. 51.

She points to her performance rating score changing as evidence of discrimination. *See* Pl.'s Opp'n 23–24; Pl.'s Resp. Def.'s SUMF 10–12. But the District has introduced uncontested evidence that Lybarger changed his rating of Truesdale from a "2" to a "3" to avoid creating a PIP. *See* Def.'s SUMF ¶¶ 39–40. Nothing in the record supports concluding that Lybarger did not "genuinely and reasonably believe" that Truesdale was a bad police officer. *Walker*, 798 F.3d at 1094. For example, Lybarger described her as "one of the worst employees I've had to supervise," and recalled having to call her on multiple occasions because the dispatcher was trying to reach her. Def.'s SUMF ¶ 34; Lybarger Dep. 25:3–18. Even though he ultimately gave Truesdale a "3,"

Lybarger included Truesdale's failure to process any arrests for the year-long period in his report. Def.'s Ex. U 3, Dkt. 48-3.

Truesdale also cites Hawkins's deposition testimony about Lybarger being "really nasty." Pl.'s Opp'n 23. Yet, Hawkins's testimony supports the District's nondiscriminatory justification—that Lybarger believed Truesdale was a bad police officer. In fact, Truesdale quotes Hawkins's testimony about her surprise at Lybarger's low scores because those scores would require an explanation, *id.* at 24, the very reason the District gives for why the scores increased from a "2" to a "3." *See generally* Def.'s SUMF ¶¶ 39–40 (Lybarger changed the score to avoid a PIP). To the extent that Truesdale's evidence reflects her subjective belief that she was a good police officer, that evidence also is insufficient. *See Khan v. Holder*, 37 F. Supp. 3d 213, 232 (D.D.C. 2014) ("[A]bsent evidence of pretext and discriminatory motive, [a] plaintiff's own opinion of the harshness of the penalty is irrelevant."). In short, Truesdale's proffered evidence does not show that Lybarger's comments about her are pretextual for discrimination or that he was trying to discriminate against her by rating her performance as a "2" and then changing it to a "3."

               iv.    Solo Patrols

Finally, Truesdale argues that she suffered discrimination because she was sent on patrols without a partner. Pl.'s Opp'n 6. Hawkins's recollection of Truesdale's solo patrols does not indicate how frequently she was assigned to patrol alone or why. *See* Hawkins Dep. 25:3–22. Likewise, as above, Truesdale fails to identify a similarly situated officer who was spared such patrols.

The District argues, correctly, that Truesdale's evidence is limited to Hawkins's anecdotal deposition testimony. Def.'s Resp. Pl.'s SDMF 25. The District also suggests that Truesdale was assigned to work by herself because no one else wanted to work with her. Def.'s SUMF ¶ 35.

Specifically, Lybarger said, "If I were to assign her a partner in roll call, almost 100 percent of the time the other employee would approach me and ask to have their assignment changed." Lybarger Dep. 26:3–7. None of Truesdale's evidence rebuts this justification, *see* Pl.'s Resp. Def.'s SUMF 9, nor does she dispute that other officers simply did not want to work with her.

*       *       *

Because Truesdale fails to establish that the District's nondiscriminatory reasons for any of the allegedly adverse employment actions are pretextual, the Court will grant the District's motion for summary judgment on Truesdale's discrimination count. *See Oviedo*, 948 F.3d at 399 (summary judgment is appropriate when a plaintiff fails to present evidence from which a reasonable jury could conclude that the employer's legitimate, non-discriminatory reasons are pretextual).

### 2.    *Retaliation Claim*

Truesdale also fails to establish that the District's proffered reasons are pretextual for her retaliation count. She limits the discussion of her retaliation claim to her report to Brescia. *See* Pl.'s Opp'n 17–18 ("Plaintiff engaged in protected activity when she reported racism and sexism to her superior (Lt. Brescia).") *see generally id.* (mentioning no other protected activity). Truesdale thus concedes the other two alleged instances of retaliation in her complaint. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) (When "a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").[5]

---

[5] Even if Truesdale had not conceded these other alleged instances of retaliation, the District cannot have retaliated for Truesdale's October 25, 2019 EEO communications when the alleged retaliation to those communications occurred on October 23, 2019, *before* she communicated with the EEO. *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly retaliatory actions preceded the protected activity precludes a determination that the

20

Her remaining alleged instance of retaliation is the insubordination investigation that followed her speaking to Brescia. *Id.* Truesdale offers no evidence, however, to dispute that an investigation is standard practice following an allegation of insubordination. *See* Def.'s SUMF ¶ 22. Because the investigation would have occurred regardless of her complaint to Brescia, Truesdale has failed to create a genuine dispute of material fact. *See Bowyer v. District of Columba*, 793 F.3d 49, 55 (D.C. Cir. 2015) (summary judgment is appropriate when the evidence supported a "legitimate, independent reason for taking an adverse action"); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 53 (D.D.C. 2011) ("Even . . . direct evidence of retaliation . . . could be negated at the summary judgment stage if defendant were able to demonstrate that it would have reached the same decision absent the prohibited discrimination."), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012).

Truesdale further argues that causation should be implied because of the proximity in time between the investigation and her comments to Brescia. While she is correct that two events that are "very close in time" can support an inference of causation, *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting *Clark Cnty Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)), "mere temporal proximity is not sufficient to" survive summary judgment, *Iyoha*, 927 F.3d at 574 (citation modified). Instead, "positive evidence beyond mere proximity is required to" demonstrate "that the proffered explanations for the adverse employment action are genuine." *Id.* (citation modified). Truesdale fails to make this showing because, as discussed above, the other evidence on which she relies does not substantiate her claim. *See id.* (granting summary judgment

---

protected activity caused the defendant to retaliate against the plaintiff."); Def.'s Mem. in Supp. 12; Am. Compl. ¶ 73. Truesdale also offers no evidence to substantiate that the July 2, 2019 SSP was in retaliation for her EEO complaint, *see* Am. Compl. ¶¶ 69–72, rather than a result of a system error, as discussed above.

to a defendant because the plaintiff "has not introduced anything beyond [her] weak evidence of temporal proximity"). It is also unlikely that the investigation was pretextual because, at its initiation, Jervic believed Truesdale was outside her block on February 18, 2019. *See* Def.'s Ex. K 7–8.[6]

Because Truesdale has not "offered evidence to call . . . [the District's] legitimate, nonretaliatory explanation" for the investigation "into question," the Court will grant the District's motion for summary judgment on the retaliation count. *Cruz v. McAleenan*, 931 F.3d 1186, 1195 (D.C. Cir. 2019).

## CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment, Dkt. 48, is granted. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2026

---

[6] While Jervic mistook Truesdale's police cruiser for another officer's cruiser, the subsequent investigation relied on GPS data that showed that Truesdale was outside her assigned block on February 18, 2019, at the relevant time—just not where Jervic thought that he saw her. *See* Def.'s Ex. K 2, 7–8.